RECEIVED 

JAN 3 2006

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| GENIE-LYN LTD., ET AL | CIVIL ACTION NO. 00-0050 |
| VERSUS | JUDGE DOHERTY |
| DELAWARE MARINE OPERATORS, INC., ET AL | MAGISTRATE JUDGE METHVIN |

### RULING

**I.    Introduction**

This case comes before the Court as the result of an allision on January 12, 1999 at dockside in Morgan City, Louisiana between the Delaware Marine Tow and the pleasure yacht, M/Y ENCHANTRESS ("ENCHANTRESS"). The ENCHANTRESS was struck by barges from the Delaware Marine Tow. The ENCHANTRESS is owned by Genie-Lyn, Limited ("Genie-Lyn"), a Cayman Islands exempt company, organized and incorporated pursuant to the laws of the Cayman Islands, British West Indies. The shareholders of Genie-Lyn were Mr. H. Eugene and Ms. Kathlyn Reeves. Ms. Reeves is now the sole shareholder of Genie-Lyn due to the death of Mr. Reeves in 2001. Certain Underwriters and Insurers at Lloyd's and Companies in London ("Lloyd's"), as Insurers of the ENCHANTRESS, are subrogated to the rights of Genie-Lyn to recover for repairs to the ENCHANTRESS.[1] Mr. and Mrs. Reeves, individually, Genie-Lyn and Lloyds each respectively have sued for damages as a result of the allision (at times hereafter collectively referred to as plaintiffs).

---

[1] Lloyd's issued hull, materials, and equipment marine insurance to Genie-Lyn covering damage to the ENCHANTRESS providing for present value replacement.

Delaware Marine Operators, Inc., American Commercial Lines, L.L.C., Continental Underwriters, Ltd., Redland Insurance Co., M/V Ted W. Ewing, Barge NM 1005 and Barge Chem 406 (collectively referred to as "Defendants") have stipulated to liability for the allision; however, defendants contest the recoverability of certain damages claimed by plaintiffs. Defendants paid for a portion of the repairs made to the ENCHANTRESS and do not contest that payment.[2] All parties agree that Lloyd's is subrogated to the rights of Genie-Lyn for the repairs for which it paid. (Stipulation of November 27, 2001, Tr. Day 1, p. 4, l. 17 - p. 5, l. 12.)

## II.    Procedural History

This matter was transferred on August 26, 2002 from Judge Tucker Melancon, after ten (10) days of trial, to this Court by Chief Judge Richard Haik due to Judge Melancon's illness. In order to proceed in lieu of Judge Melancon, this Court was required to comply with Federal Rule of Civil Procedure 63, which states in pertinent part:

> If a trial or hearing has been commenced and the judge is unable to proceed, any other judge may proceed with it upon certifying familiarity with the record and determining that the proceedings in the case may be completed without prejudice to the parties. ...

This Court held multiple status conferences with counsel in order to clarify the Court's understanding of the previous proceedings, the law applicable to this case, to set forth deadlines for the expeditious movement of the case, to order additional briefing, and to identify and provide the Court with those portions of the previous ten (10) day trial transcript which they felt supported their respective positions, as well as those portions of the transcript to which counsel wished to draw this

---

[2]  Defendants paid a total of $78,050.80 to Breaux's Bay Craft and $59,733.27 to CJC Shipyards for repairs; those amounts are uncontested.

Court's immediate attention. The Court thus certifies its familiarity with the record as required by Rule 63.

On March 19, 2003, prior to the commencement of the trial in this Court, one of the Defendants, American Commercial Lines, LLC, filed a Notice of Bankruptcy. A stay was ordered on March 19, 2003. Counsel were advised the stay would have to be addressed in order for the matter to proceed. The Court received notice of the lifting of the bankruptcy stay on June 17, 2004. This matter was thereafter scheduled for completion of trial for January 18, 2005.

The Court heard evidence for four (4) additional days, from January 18 to 21, 2005. All motions for judgments as a matter of law were denied. Further briefing was requested by the Court. The Court recessed on January 21, 2005 in order to review depositions submitted at trial and allow counsel to submit additional briefs and this Court to review those briefs. Closing arguments were heard on January 31, 2005.

## III. Factual Background

The ENCHANTRESS was originally constructed in 1969 at Breaux's Bay Craft in Morgan City, Louisiana. Eugene Reeves purchased the ENCHANTRESS in 1998. Soon thereafter, Mr. Reeves had a survey of the yacht conducted to assess its pre-sale condition. (Defendant's Exhibit 103.) Mr. Reeves also began speaking occasionally with Hub Allums of Breaux's Bay Craft about the condition of the vessel and repairs the Reeves wished to make. (Hub Allums, Tr. Day 1, pp. 81 and 82.) Mr. Reeves was apparently dissatisfied with work he had had done on the ENCHANTRESS in Florida, thus Mr. Allums suggested additional work might be done in Morgan City, Louisiana prior to a trip around the world the Reeves wished to make. (Hub Allums, Tr. Day 1, p. 81.) Mr. Reeves subsequently took the vessel to Morgan City for certain repairs.

On January 12, 1999, while dockside in Morgan City, the ENCHANTRESS was struck by barges from the Delaware Marine Tow. Just before the barges struck the vessel, Mr. and Mrs. Reeves and their Captain jumped from the yacht; Mr. Reeves stumbled after making the jump. The Reeves and their Captain then made their way some seventy (70) or eighty (80) feet along the seawall before the allision occurred. The barges struck the ENCHANTRESS on the starboard side. After providing a report to the port authorities, the Reeves were able to reboard the ENCHANTRESS and spent the night aboard the yacht.

The day after the allision, Douglas DeLoach, Manager of Safety and Training for Delaware Marine Tow, visited with Mr. Reeves aboard the ENCHANTRESS to discuss repairing the vessel. During this conversation, it is alleged by Mr. Reeves that Mr. DeLoach told him, "You'll be fixed as good as new." Soon thereafter, Continental Underwriters, Ltd. ("Continental"), Delaware Marine Tow's insurer, sent its marine surveyor, Clay McGlasson, to survey the damage to the ENCHANTRESS and prepare a report. Mr. Reeves also notified his insurer, Lloyd's, who sent their marine surveyor, Si Williams.[3]

The day after the allision, *Mr. Reeves* called Hub Allums and asked him to do the necessary "aluminum work" on the ENCHANTRESS, as Mr. Reeves desired Breaux's Bay Craft to do the "aluminum work" and use the same aluminum they had used in the original construction. (Hub Allums, Tr. Day 1, pp. 88 and 89.) Mr. Allums testified the "aluminum work" on the

---

[3] It was at this point that the situation began its deviation from the customary progression. Lloyd's chose to allow Continental to conduct the only preliminary survey made on the ENCHANTRESS. Mr. Williams did, however, attend the preliminary survey as a representative of Lloyd's, and reviewed Mr. McGlasson's findings, but he made no comments. According to Mr. McGlasson, this was an unusual situation, as normally, the surveyor for the underwriter of the damaged vessel is the surveyor who conducts a survey for the owner of the vessel and then presents the survey to Continental for approval of the noted repairs. (Tr. Day 2, pp. 282-284.)

ENCHANTRESS was thereafter begun by Breaux's Bay Craft in the same manner and using the same materials as when it was originally built in 1969. While completing this structural work on the hull, Breaux's also performed certain non-allisional repairs requested by Mr. Reeves, including the repair of six (6) bottom longitudinal in-weight stabilizers. (Hub Allums, Tr. Day 1, p. 111.)[4]

Very soon after the allision, testing was done to determine if there were cracks in the hull and if any racking or twisting had occurred from the allision. The yacht was tested at Bollinger Shipyard and no evidence was presented that racking had occurred. (Exhibit D-1B, at p. 6; Clay McGlasson, Tr. Day 2, pp. 314-316.)[5]

In mid-February 1999, the Reeves took the vessel to CJC Shipyards due to Breaux's inability to continue repair of the vessel because of prior commitments. CJC Shipyards was to complete the "aluminum work" as well as conduct other repairs. On February 22, 1999 a meeting was held at CJC Shipyards among certain parties, including the following: Allen Eschette (project manager for CJC), Steve Sweetser (president of CJC), Si Williams (marine surveyor for Lloyd's), Clay McGlasson (marine surveyor for Continental) and the Reeves. The meeting was held in order to facilitate completion of the repairs and to obtain estimates from two (2) paint representatives (M&D Yacht Refinishing, Inc. and Structure Marine, Inc.) The paint representatives agreed the entire hull and

---

[4] Continental Underwriters paid Breaux's Bay Craft $78,050.80 for the repairs done to the ENCHANTRESS. (Clay McGlasson, Tr. Day 1, p. 73 and Tr. Day 2, pp. 280-282. Plaintiffs' Exhibit P-14.) Nothing in the record reflects that a reduction was made or sought by Continental Underwriters for non-allision related work done on the ENCHANTRESS at Breaux's Bay Craft.

[5] Mr. McGlasson's testimony cited above explains that the Bollinger invoice states "inspect underwater bottom, shoot keel with laser transit to check straightness of keel." Mr. McGlasson testified that that entry meant "[c]heck to see if it has been racked or check and see if there's underwater damage." Id. at 316. Joseph Lombardi, Lloyd's marine surveyor, testified at trial that "racking" never came up in any of his survey reports generated contemporaneously with his work in this case. The first time he used the word "racking" or "compression" in a report is when he prepared an expert report in preparation for this litigation. (Testimony of Joseph Lombardi, Tr. Day 7, pp. 20-34.)

superstructure would require painting in order to match the vessel's coating system. (McGlasson's Report, Exhibit D-1B, p. 9.) Continental's marine surveyor, Mr. McGlasson's Report of August 4, 1999 describes the painting process for the ENCHANTRESS as follows:

> Manually sand entire hull to bare aluminum, spot prime hull with AWLGRIP 30-Y-94, anti corrosive, epoxy primer. Prime with four coats of AWLGRIP 545 epoxy primer. Apply four coats of AWLGRIP premium urethane paint. NOTE: Between each application the hull was to be hand sanded smooth/flush.

The two (2) painting contractors submitted the following bids:

| | |
|---|---|
| M & D Yacht Refinishing, Inc. | $250,000.00 [6] |
| Structure Marine, Inc. | $320,000.00 |

Neither bid was accepted. The vessel remained at CJC Shipyards approximately two (2) weeks while CJC and the Reeves awaited approval by Continental for the work to be done by CJC. Approval for certain work was given by Continental, and work began in earnest on March 3, 1999. (Kathlyn Reeves, Tr. Day 9, p. 50) (See plaintiffs' exhibit P-36, attached hereto as Court Attachment A for a description of the work conducted at CJC).

In March, the relationship between the Reeves, Mr. McGlasson and Mr. Williams, which up until that point had been good, began to deteriorate. The deterioration began when Mr. McGlasson was called to CJC Shipyards to address additional problems surfacing from the conducted repairs. Mr. McGlasson notes the following in his report:

> On March 11, 1999, the undersigned attended the ENCHANTRESS at the facilities of CJC Contractors. The undersigned was notified by the vessel owner that numerous leaks were noted in way of the deck/teak wood, and that water was noted to have

---

[6]    Testimony of Steve Sweetser indicates a previous successful working relationship between CJC and M&D Yacht Refinishing, Inc. located in Florida. (Tr. Day 1, pp. 150-151) Mr. Sweetser testified it would have taken M&D three (3) to four (4) months to complete the painting of the ENCHANTRESS at the dockside facilities of CJC Shipyards.

ingressed the vessel through cracked areas and was causing damage to the interior.

At the time of the examination, personnel with CJC Contractors were removing furnishings and equipment from the second deck of the superstructure. Additionally, personnel with CJC Contractors were completing the welding of the aluminum hull repairs, cleaning up aluminum and cleaning up aluminum shavings.

During the course of the examination of the deck leaks, items were noted as follows:

Stainless screws which were drilled into the aluminum deck to tack down the strips of teak wood boards were reported to have been broken as a result of the collision incident, and subsequently rain water was permitted to leak into the interior of the vessel. NOTE: When the undersigned had arrived the suspect areas had already been temporarily repaired with glue/tape to waterproof the areas in way of the two outboard teak wood deck boards at the first and second deck.

The vessel owner reported to the undersigned that he would like to remove all of the teak wood boards in way first and the second deck and repair all of the broken stainless screws. While this condition was never noted and/or mentioned until recently, there was little and/or minimal rain. The undersigned informed the vessel owner that he should contact his surveyor and inform him of the above mentioned problem.

(Exhibit D-1B, p. 10)

Mr. McGlasson testified because some seventy (70) boards had been taken up at Mr. Reeves'

instruction before his arrival, Mr. McGlasson was unable to assess the problem with the leaking.

Mr. McGlasson's Report further reflects Mr. Reeves had also discovered problems with the

port and starboard anchors:

It was reported to the undersigned that the anchors were noted to be bent at the flukes commencing just outboard of the hawse pipes. The undersigned explained to the vessel owner that his reported damage to the anchors could not have been sustained as a result of the collision due to the location of the anchors; however, the undersigned informed the vessel owner that the undersigned would discuss this matter with his surveyor, Mr. Williams.

(McGlasson's Report, Exhibit D-1B, p. 10.)

7

Mr. McGlasson's report reflects that at this point, he became concerned that continual problems and issues were arising with respect to the ship's repairs. He was concerned that the problems Mr. Reeves continued to locate or find were not being forwarded to Mr. Reeves' surveyor, and stated in his report that any decision to repair and/or renew anything on the boat resulting from the collision should come from Mr. Williams and/or the vessel owner, rather than himself. (McGlasson's Report, Exhibit D-1B, p. 10.) Because of his concerns, Mr. McGlasson advised Mr. Reeves to notify Lloyd's about the noted problems and ongoing repairs.

At this point Si Williams, Lloyd's Marine surveyor, became more pro-active in the process and, according to Ms. Reeves, Mr. Maginnis, attorney for Lloyd's, stepped in and "took over the operation." (Kathlyn Reeves, Tr. Day 9, p. 99.) Mr. Williams also advised Mr. Reeves to hire his own surveyor due to a potential conflict of interest. Upon the advice of Mr. McGlasson, Mr. Reeves hired Kyle Smith. (Ms. Reeves, Tr. Day 9, pp. 99-101.)

It is clear to this Court that up until this point, mid-March 1999, the standard procedures in a situation such as this had not been observed. Mr. McGlasson's Report, Exhibit D-1B, p. 11 states:

> Upon the completion of the examination a meeting was set to take place on March 16, 1999, at the facilities of CJC Marine. It was the opinion of the undersigned that work being conducted at this yard was getting out of control. The vessel owners had personnel at the yard working on different sections/areas of the boat, some related to the collision incident, some not related, and some items had not been identified as collision related and/or not collision related. Further, it appeared that work was placed in hand by the vessel owner on his surveyor and/or responsible party could examine the areas in question.

Kyle Smith testified that after he was hired, the parties performed a Joint Survey on March 16, 1999 in order to determine definitively those repairs that were allision related and those that were not. In attendance were James Johnson, representing Delaware Marine and its underwriters, Si

Williams, representing Lloyd's underwriters, Ryan Uhlick, representing Continental's underwriters, and Kyle Smith, representing the Reeves, According to Mr. Smith, all of the surveyors present had previously worked together and had a good working relationship. Therefore, according to Mr. Smith, they jointly inspected the vessel and drafted a joint report dated August 4, 1999, listing the repairs that needed to be made. (Kyle Smith, Tr. Day 3, pp. 29-48.) The Joint Survey was to be the road map for completion of the repairs. None of the surveyors voiced an objection to the Joint Survey, and upon completing the report, all four went together to Seacraft Shipyard to get a bid on the agreed upon repairs. (Mr. Kyle Smith, Tr. Day 3, pp. 48 - 51.)

The Joint Survey conducted March 16, 1999 and written on August 4, 1999 listed the following repair work as allision related:

1. Complete the aluminum hull repairs.
2. Repair deck leaks in way of the first and second deck. Renew teak wood boards.
3. Test all fuel and water tanks.
4. Paint vessel as specified by coating specialist.
5. Replace broken porthole in the engine room.
6. Repair engine room leaks at the inspection doors.
7. Clean up all working space areas.
8. Renew aluminum hand rails on the second deck.
9. Install new carpet in way of the second deck due to deck leaks.
10. Replace new bumpers, canvas, and hinges at the fire doors.
11. Test hydraulic crane on the second deck.
12. Repair/straighten the starboard side aft end of the second deck of the overhang. Corner was noted to be sagged down 0" to 1".
13. Provide the services of an electrician to trouble shoot vessel electronics and make recommendations as necessary.

In mid-March, 1999, Mr. Reeves, on his own, chose to contact Little Harbor Marine of Rhode Island to discuss painting the ENCHANTRESS. (Ben Sheets, Tr. Day 3, p. 248.) On April 15, 1999 the crew from Little Harbor Marine inspected the ENCHANTRESS in Louisiana and submitted a

bid of $190,422.00 for painting only.

A May 17, 1999 meeting was held among certain parties at CJC Shipyards in order to discuss additional problems.[7] (See McGlasson Report, Defendant's Exhibit D-1B, p. 12.) At the meeting, Mr. and Ms. Reeves presented eleven additional items which they wanted repaired. Mr. McGlasson informed all parties present that the additional eleven (11) items appeared to be non-allision related. At the same meeting, the Reeves informed Mr. McGlasson that the ENCHANTRESS would depart from CJC Contractors on May 24, 1999 for painting at Little Harbor Marine in Rhode Island.[8] By the time the ENCHANTRESS departed Morgan City, Mr. Reeves had obtained an additional bid of $117,000 from Little Harbor Marine to replace the main teak deck.[9] In early August, Mr. Maginnis, acting on behalf of Lloyd's, accepted the bid by Little Harbor Marine and agreed to allow them to replace the teak deck. The record reflects no further contact between Lloyd's Underwriters and Continental Underwriters until the instant suit was filed.

The ENCHANTRESS departed Morgan City on or about the 24th of May 1999 and arrived in Little Harbor, Rhode Island on June 13, 1999. Once on the East Coast, Joseph Lombardi took over surveyor/supervisor responsibilities from Mr. Williams on behalf of Lloyd's. Mr. Lombardi

---

[7]In attendance at the meeting were: Mr. and Mrs. Reeves, Mr. McGlasson, Mr. Williams, Mr. Maginnis, Tom Wetzel (Delaware Marine's underwriter), and Continental's attorney. (Exhibit D-1B, p.12.)

[8] Mr. McGlasson's Report, Exhibit D-1B, indicates that Mr. Reeves' offered to settle the entire matter for the sum of $484,000.00 at that meeting. Significant only from a factual standpoint, this offer to settle included a $190,000.00 amount for the "painting of the vessel" and $60,000.00 to "replace teak deck boards."

[9] Stipulation at trial reflects a bid of $117,000.00 was given to Mr. Reeves, at his request, by Little Harbor Marine for the replacement of the main teak deck of the ENCHANTRESS.

reported to Mr. Maginnis, counsel for Lloyd's.[10]

Prior to the departure of the ENCHANTRESS from Morgan City, Mr. Maginnis contacted Mr. Wetzel by telephone to discuss what further repairs would be required with respect to the painting and fairing of the ENCHANTRESS. On advice from a second marine surveyor hired to address painting issues, Ryan Uhlich, as well as the advice of Mr. McGlasson, Mr. Wetzel offered to have the entire hull painted from the waterline up. (Tr. Day 2, pp. 167, 184-186.) According to Mr. Wetzel, Mr. Maginnis believed the vessel needed more extensive painting than Continental was willing to pay for. However, no documentary evidence was presented as to Continental's belief as to the necessary painting and its costs either before or after the departure of the ENCHANTRESS from Morgan City. (Tr. Day 2, pp. 184-188.)[11]

Plaintiffs have brought suit for the entire panoply of repairs they allege resulted from the alleged damage to the ENCHANTRESS incurred due to the allision. Defendants dispute many of those damages as not being allision related and raise defenses to certain of those which were allision

---

[10] This court has the same concerns over this arrangement as did Judge Melancon. (See Tr. Day 9, pp. 67-68.) It would seem to give rise to a conflict of interest to have had Lloyd's counsel handle this claim for Lloyd's, receive and process all of the information, and sign off on all additional expenses for the ENCHANTRESS at Little Harbor Marine, and then present this same evidence as advocate for Lloyd's at trial. This Court notes a discussion between Mr. Maginnis and Judge Melancon at trial, which reflects an inherent problem with this case: there was no consistent, involved adjuster for Lloyd's, and no true connection or contact with Continental Underwriters geared toward trying to seek consensus. It is evident that Judge Melancon, as well as this Court, found the lack of a manager or adjuster on behalf of Lloyd's Underwriters to be problematic. Mr. Maginnis was approving additional amounts requested for repairs to the ENCHANTRESS by Little Harbor Marine after review by Mr. Lombardi, Lloyd's surveyor. Much of this activity on the part of Mr. Maginnis took place without any notice to or formal demand being made for payment on Mr. Wetzel, Continental's Underwriter.

[11] Had there been meaningful communication between Lloyd's and Continental, the opportunity to evaluate the additional amounts allegedly needed for repairs to the ENCHANTRESS and to pay or deny the claim would have existed, as is the customary practice in insurance damage claims.

related. The Court will consider the claims now remaining before the Court:[12] (1) property damage claims of Genie-Lyn and/or Lloyd's through subrogation; (2) amounts spent on behalf of the Genie-Lyn by its shareholders, Mr. and Mrs. Reeves; (3) personal injury claims of the Reeves; and (4) claims for miscellaneous expenses incurred by the Reeves and others on behalf of the corporation and alleged as a result of the allision and repair.

## IV.     Applicable Law

### A.     General Maritime Law

Plaintiffs have brought their claims under the admiralty and maritime jurisdiction of this Court. When a cause of action arises under maritime law, damages issues are governed by federal law. Freeport Sulphur Co., v. S/S Hermosa, 526 F.2d 300, 302 n. 2 (5th Cir. 1976). The proper measure of damages in a maritime tort action is compensation. Pizani v. The M/V COTTON BLOSSOM, 669 F.2d 1084, 1088 (5th Cir. 1982). "The purpose of compensatory damages...is to place the injured person as nearly as possible *in the condition he would have occupied if the wrong had not occurred*." Freeport Sulphur Co. v. SS Hermosa, 526 F.2d 300, 304 (5th Cir. 1976) (emphasis added). As liability is not contested in this matter, the only matter left to be resolved is that of damages for both the alleged personal injury and property damage.

#### 1.     Property Damages Under Maritime Law

The Court's analysis begins with the finding that the property involved in this matter is not a total loss, and therefore the Court will look to the maritime law of damages applicable when

---

[12] Extensive discussion and briefing was had to clarify and identify the claims actually made by the multiple plaintiffs, on whose behalf, and for what alleged damages. Extensive discussion and briefing was also had to determine which of those claims survived the prior rulings of Judge Melancon, and which had been abandoned by plaintiffs. The claims noted above are those claims all parties agreed actually were made and which all parties agreed remained as of trial before this Court.

property is repaired or replaced.[13]  "A party suffering injury to his property is entitled to no more than *restoration to its condition prior to the wrong*." M/V Elaine Jones v. Griffith, 480 F.2d 11, 27 (5th Cir. 1973) (emphasis added).  A maritime tort defendant is not to be held liable *for property damage he has not been shown to have caused* or for the cost of repairs *that enhance the value of the damaged property compared to its pretort condition*.  Pizani at 1088 (emphasis added).  The **plaintiff** bears the burden of proof to show the amount, as well as the fact, of damages.  Id. Therefore, when a plaintiff submits a figure denominated "the cost of repairs," and a defendant shows that figure includes noncompensable improvements, **the plaintiff must then prove** the amount of the improvements, *i.e.*, the amount by which the original figure must be reduced.  Id. However, it is within this Court's admiralty jurisdiction to apply the equitable principles of the admiralty to this Court's decision with respect to a plaintiff's ability to meet the required burden of proof.  Id at 1089.

Under maritime law a party suffering injury to his property may recover only that which is necessary to restore his damaged property to the same condition as existed immediately prior to the tort, thus, defendants argue the principles of depreciation and betterment should serve to reduce plaintiffs' recovery.  City of New Orleans v. American Commercial Lines, Inc., 662 F.2d 1121, 1124 (5th Cir. 1981) (citing Elaine Jones, 480 F.2d at 27).  If repair or replacement costs form the basis of a damage award, the Court must determine whether the repair or replacement adds new value to or extends the useful life of the property (betterment).  Elaine Jones at 27 (upholding no reduction for

---

[13]In cases where there is a constructive total loss or an actual total loss, the measure of damages is generally the market value of the property just before the loss (less the value of any salved equipment or materials) and does not include loss of use or other consequential damages.  B & M Towing Co. v. Wittliff, 258 F.2d 473, 475 (5th Cir. 1958).

depreciation where district court found an indefinite useful life of plaintiff's bridge). If the repair or replacement adds new value or extends the useful life of the property, the Court should make an appropriate reduction to the repair or replacement costs (depreciation). Freeport at 304. To this end, the Court first must determine what damages are actually a result of the allision, and then what repairs were commanded by that damage, and only thereafter, what the expected useful life of the property was before the damage was sustained, what the expected useful life of the property is after repairs or replacement, and what amount, if any, should be reduced from an award in order to account for any prior depreciation or any anticipated betterment.

Where the expected useful life of the property after repairs is the same as it was at the time of the acquisition by the plaintiff, and the loss is not coextensive with the acquisition, the straight-line depreciation formula should be applied.[14] Freeport at 306. If the repairs do not extend the useful life of the property as it existed just before the collision, there should be no deduction for depreciation. Id. Where the repairs extend the useful life of the property, but to a different degree from the expected useful life of the property at the time of its acquisition by the plaintiff[15], the following must occur: the court must calculate the percentage of the repair expenses representing the cost of the useful life extension. This percentage should be the portion of the total useful life of the repaired property that the useful life extension constitutes. The allocable cost of the useful life extension may then be derived by multiplying this percentage by the total repair expenses. If this

---

[14]For example, if the property when acquired by the plaintiff had a useful life expectancy of twenty-five years, and after repairs has a useful life expectancy again of twenty-five years, the straight-line depreciation formula is appropriate.

[15]As in Freeport, where the dock had a pre-collision remaining useful life expectancy of twenty-five years, but after repairs, its useful life was extended to thirty-five years.

allocable cost is then deducted from the total cost of repairs, the resulting damages award will compensate the plaintiff for the cost of restoring his property to its precollision condition. Id.

Plaintiffs counter that depreciation should not be applied in this matter, citing the statement contained in Freeport at 306 (and noted above) that where the repairs do not extend the useful life of the property as it existed just before the casualty, there should be no deduction for depreciation.

In its analysis of damages in this matter, the Court will consider the concepts of betterment and depreciation, if appropriate, under the law as cited above.

### 2. Personal Injury Damages Under Maritime Law

The law addressing the personal injury claims brought by Mr. and Ms. Reeves will be discussed in Section VII, *infra*.

### B. Property Damages – Oral Contract

Plaintiffs additionally argue the principles of betterment and depreciation should not apply to the property damage claims because Delaware Marine, through their agent, Douglas DeLoach, created an oral contract with Eugene Reeves to repair the ENCHANTRESS "as good as new," which plaintiffs argue takes the damage claim out of the realm of tort and into the realm of contract or quasi contract. Plaintiffs, thus, argue defendants may not take advantage of the benefits afforded by the principles of betterment and depreciation which apply in tort, because there existed an oral contract which removed the claim from one couched in tort, to one couched in contract, and the contract did not contemplate the operation of betterment and depreciation.

In making his arguments, plaintiffs' counsel urges the application of Louisiana law to the issue surrounding the alleged oral contract. Counsel argues maritime law should not apply to the alleged contract because it is not a contract to repair a vessel – which all agree would be governed

by maritime law – but an *agreement* to repair a vessel, and, therefore, general maritime law should not apply.

Thus, Plaintiffs cite Louisiana Civil Code article 1846 in support of their position, which states:

> When a writing is not required by law, a contract not reduced to writing, for a price, or in the absence of a price, for a value not in excess of $500 may be proved by competent evidence. If the price or value is in excess of $500, the contract must be proved by at least one witness and other corroborating circumstances.

Although the Court finds plaintiffs' argument as to the applicable law problematic, it need not make that determination at this juncture, as the same general elements are required under either the cited Louisiana law or the general maritime law in order to perfect a contract, i.e. offer, acceptance, consideration, and most importantly a "meeting of the minds." *See* J. CALAMARI & J. PERILLO, CONTRACTS § 4-1 (2d ed. 1977); Fourchon, Inc. v. Louisiana Nat. Leasing Corp., 723 F.2d 376, 387 (5th Cir. 1984). This Court also notes that although, "admiralty principles govern contracts for vessel repair and conversion," Ham Marine, Inc. v. Dresser Industries, Inc., 72 F.3d 454, 459 (5th Cir. 1995), "in the absence of a federal statute, a judicially-fashioned federal rule, or a need for uniformity throughout admiralty jurisdiction, relevant state law may be applied." Koninklyke Nederlandsche Stoomboot Maalschappy, N.V. v. Strachan Shipping Co., 301 F.2d 741, 743 (5th Cir. 1962). Nonetheless, this Court notes, also, oral contracts are generally regarded as valid by maritime law. *See, e.g.*, Kossick v. United Fruit Co., 365 U.S. 731, 734 (1961). Thus, this Court will now turn to the facts surrounding the alleged oral contract and for reasons fully explained below, this Court finds there was not a meeting of the minds as required by either body of law.

Plaintiffs base their claim of an oral contract on a conversation which occurred between Mr.

Reeves and Douglas DeLoach on January 13, 1999. Mr. DeLoach testified as follows:

The Court: Now on behalf of your then employer, your then employer's insurer or
[J. Melancon] anybody else, what kind of representations did you make to Mr. or Ms. Reeves or anyone else, the captain or anyone else, about what your employer was going to do or his insurer was going to do?

The Witness: I don't recall making any or having any type of conversation that we were, you know, going to do anything. It was an unfortunate accident that our vessel was involved in, that we were going to try to take care of the problem.

The Court: Did you express regret that the accident occurred?

The Witness: Yes, sir.

The Court: Did you indicate to them that you did have insurance?

The Witness: Yes, sir.

The Court: Other than regret that it occurred and that we have got insurance, did you make any commitment about any particular things being fixed?

The Witness: Oh, no, sir.

The Court: Did you make a statement that we're going to repair your boat?

The Witness: I think I might have made a statement that, you know, we're going to take care of the damages."

(Tr. Day 2, pp. 141-142.)

Mr. Reeves testified regarding his conversation with Mr. DeLoach at his Deposition as follows:

"[A]nd we will fix you. As this gentleman can tell, the word fix don't tell me much. So I said, How are you going to fix me. If I didn't like the answer, you would have had a ton of lawyers setting there.

And he said we're going to fix you. I said, no, no, no. How? It's a term they use in the steel business. He said, You'll be fixed as good as new." (Mr. Reeves Deposition, p. 45.)

It is the alleged use of the statement "You'll be fixed as good as new" that is the primary source of the contract dispute between the parties.

Captain Young, Captain of the ENCHANTRESS and witness to the conversation between Mr. DeLoach and Mr. Reeves, remembered the conversation differently than Mr. Reeves. When asked by the Court about his recollection of Mr. DeLoach's statement to Mr. Reeves, Capt. Young testified as follows:

> The Witness: Mr. DeLoach said, 'We're going to fix your boat.'
>
> The Court: Well, let me ask you, what did you take that to mean? That's a pretty
> [J. Melancon] generic statement, 'We're going to fix your boat.' Obviously, somebody had really screwed up. Something had gone terribly wrong. You are sitting at the dock. You get rammed by some barges that had broken away from a boat that DeLoach's company was in charge of and he says we're going to fix your boat. What did that mean to you?
>
> The Witness: That meant to me they were going to fix the boat. They were going to repair the boat.
>
> The Court: All right. Did he say anything more specific than we're going to fix
> [J. Melancon] your boat?
>
> The Witness: Not that I recall."

(Tr. Day 2, pp. 103 and 104.)

At trial, Kathlyn Reeves was unable to produce any documentation confirming a promise made by Mr. DeLoach or Delaware Marine to make the vessel "as good as new." (Tr. Day 10, p. 45.) Ms. Reeves further testified she did not expect Delaware Marine to make her vessel better than it was before the allision. (Tr. Day 10, p. 47, lines 7-23.)

Plaintiffs, also, argue that because Delaware Marine and Continental Underwriters did not seek a reduction for betterment or depreciation for the repairs to the hull of the ENCHANTRESS made prior to its departure from Morgan City, this ratifies or reflects the existence of the oral

18

contract to repair the yacht to "as good as new" *without the application of betterment or depreciation.*[16] This Court disagrees.

Based upon the evidence presented as to the conversation between Mr. Reeves and DeLoach and for the reasons cited below, this Court finds no evidence of the existence of a binding oral contract to repair the ENCHANTRESS to a condition "as good as new," meaning a condition better than before the allision occurred. Further, this Court finds Delaware Marine's forbearance in not seeking reduction for the hull work on the vessel or repairs made at Breaux's Bay Craft or CJC Shipyards reflects the more reasonable interpretation of the statement made: Delaware Marine intended to take care of the damages caused to the ENCHANTRESS by the allision quickly and without complication.

Also, based upon the evidence presented, this Court finds the record does not support plaintiffs' argument there was any agreement to repair beyond what tort law would otherwise provide. Ms. Reeves herself testified she did not anticipate the vessel would be fixed to any condition other than its pre-allision condition. The testimony of Mr. Reeves, Mr. DeLoach, and Capt. Young was contradictory in its particulars but consistent in its generality. This Court finds the remark made by Mr. DeLoach to Mr. Reeves immediately after the allision was more in the nature of acceptance of responsibility for whatever damages might have been caused by the allision and an expression of their intent to repair the damage. To suggest it should carry greater weight or legal importance, is not supported by the brief informal conversation within which it was said, and

---

[16] This Court notes with interest that the insurer of the vessel, Lloyd's, the plaintiffs by subrogation, were obligated to repair "good as new" by way of the replacement value clause in their insurance contract on the vessel. Now, as plaintiffs by way of subrogation to the vessel owners' interests, they seek the costs expended to repair the vessel to "good as new" status from the tort feasor, who absent some contractual obligation, is not obligated to repair the vessel to a condition better than that which existed at the time of the allision.

evidence presented surrounding those circumstances. Nor does the evidence support a finding that even if there had been an attempt to create such a contract - which this Court specifically finds the evidence does not support – there was a meeting of the minds between Mr. DeLoach - whatever his authority to act on behalf of his employer – and Mr. Reeves as to what the disputed statement meant.

Clearly, DeLoach merely intended to assuage Mr. Reeves' concern that his vessel had been damaged and not to formally bind his company to some undefined contractual obligation. However, equally as clear, Mr. Reeves heard an open-ended promise to do whatever he deemed required to correct the unfortunate situation. Such radically different understandings and the actions following the allision illustrate a complete absence of a meeting of the minds as between the two alleged principles to the alleged contract. This situation was further complicated when the normal process of submitting bids for repair was not followed, and when the insurer of the vessel also had an obligation to repair the vessel - but to a higher standard - i.e. replacement value, and became the arbiter of what was to be repaired and how.

Without a meeting of the minds, no contract can exist, even if this Court were to find Mr. DeLoach intended his statement to go beyond a general, basic, acceptance of responsibility for whatever damage the allision had caused. Therefore, this Court finds there was not the requisite "meeting of the minds" between the Reeves and Mr. DeLoach as to the extent of the repairs to be made to the ENCHANTRESS. Therefore, this Court finds no basis in the evidence presented to find an oral contract that would remove plaintiffs' claims from the application of the general maritime tort law principles.

## C.     Promissory Estoppel

Plaintiffs also argue that if this Court finds no oral contract existed, alternatively the doctrines

of estoppel and detrimental reliance should apply against Delaware Marine "for breach of the agreement for prompt and complete repairs to the vessel." (Plaintiffs Tr. Outline, p. 9.) In the present case, defendants argue plaintiffs have neither pled estoppel, nor had they raised or pled the essential elements of a plea of estoppel in regard to their maritime tort claim until the submission of their trial outline.[17] However, as the Court finds promissory estoppel to be inapplicable under the facts of this case, it need not address the issue of waiver.

The Restatement of Law 2d - Contract §90(1) defines "estoppel" as:

A promise which the promissor should reasonably expect to induce action or forbearance on the part of the promissee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

The Fifth Circuit in Ingalls Shipbuilding, Inc. v. Director, OWCP, 976 F.2d 934, 935 (5th Cir. 1992), asserts that the following are the elements of promissory estoppel:

1. That the party to be estopped is aware of the facts;

2. That the party to be estopped intended his act or omission to be acted upon;

3. That the party asserting estoppel did not have knowledge of the facts; and

4. That the party asserting estoppel reasonably relied upon the conduct of the other to his substantial injury.

The Court finds that estoppel is inapplicable to the specific facts of this case. This Court has previously found no oral contract existed to fix the vessel beyond what would be required by tort

---

[17]Defendants cite United States v. C.I.T. Construction, Inc., 944 F.2d 253, 258 (5th Cir. 1991) in support of their position that plaintiffs should be barred from bringing claims based upon promissory estoppel and detrimental reliance. However, the specific holding of that case was that plaintiff could not raise the doctrine of *judicial* estoppel *on appeal* because its failure to plead estoppel means that it waived that issue.

law. In fact, this Court specifically found the evidence did not support a finding of a promise or offer having been made by Mr. DeLoach beyond admission of the intent to make whatever repairs might have been occasioned by the damage resulting from the allision. (See section IV B, *supra*.) Plaintiffs have proven the existence of no other promise entitling them to reasonably believe defendants would repair the vessel over and above that which is required by tort law.

Furthermore, the record reflects evidence of no promise or any nature of agreement or any meaningful discussion at all, with respect to the main issues of dispute - i.e. the painting of the vessel and the replacement of the teak decking - and thus, there is no basis upon which plaintiffs could have reasonably relied on Delaware Marine or Continental Underwriters to pay for these items as completed at Little Harbor Marine without further discussion.[18]

Additionally, Plaintiffs had full knowledge of all facts and the large conflict over the extent of repairs necessitated, from at least the beginning of March of 1999. All parties, including Lloyd's and the Reeves, became aware of the conflict concerning the repairs to the ENCHANTRESS at least as of the point in time when Clay McGlasson, Continental's surveyor, told plaintiffs to hire their own surveyor and to report any problems to the Lloyd's surveyor. Thus, any action taken by plaintiffs thereafter could not have been based upon reliance upon an agreement with or promise made by defendants to cover those costs. Rather, Mr. Reeves, acting on behalf of the corporate entity, relied upon Lloyd's (Genie-Lyn's insurer) approval and agreement to pay when making his decision as to the breadth and extent of the repairs he ordered. The record is replete with examples of Mr. Reeves'

---

[18] Clay McGlasson arrived at CJC on March 11, 1999 to find that areas of the teak deck had been torn away before he had an opportunity to investigate the claim of leaking. (Testimony of Clay McGlasson, Tr. Day 2, p. 274.) The Reeves found Little Harbor themselves and took the vessel there without prior approval from Continental while discussions were being held about the two (2) bids for painting received at CJC. There is no evidence anyone at Little Harbor had any contact or communication with Continental.

reliance upon approval made by his insurer, Lloyd's and its agents and not Continental and its agents. And, again, this Court notes Lloyd's had a greater obligation to repair than did the tort feasor.

Plaintiffs possessed a comprehensive insurance policy on the vessel that provided replacement of "new for old," which allowed Genie-Lyn to receive repair of the vessel at present cost without reduction for depreciation or vessel improvement from Lloyd's. Thus, the ENCHANTRESS, pursuant to the insurance contract, was entitled to receive *from Lloyd's* repair beyond what general maritime law would require *Continental* to pay. Lloyd's now, by way of subrogation, makes claim against Continental for that amount the law of tort would not require a tortfeasor to pay. All money paid for repairs to the ENCHANTRESS, other than the Reeves' living expenses while in Rhode Island and those originally paid by Continental and not disputed by Continental, was paid by Lloyd's. Lloyd's now makes claims against Continental for those amounts yet, has provided no persuasive legal basis for that claim.

The evidence also, is clear, the Reeves chose to remove the vessel to Rhode Island for painting and repair to the teak deck without sufficient notice to Continental. The expenses incurred in the voyage to Rhode Island – of which Continental gave no approval – were not, in any way, induced by actions of the defendants. Further, neither Genie-Lyn or Lloyd's was prejudiced by any delay in repair or any voluntary delay in making full demand upon Lloyd's, as their insurer was put on notice initially and at all times had its interests represented. Lloyd's paid for all expenses and costs sought by the Reeves with full knowledge of the situation. Accordingly, for the above stated reasons, this Court finds Genie-Lyn and Lloyd's have failed to establish the elements of promissory estoppel as required by Ingalls Shipbuilding, Inc. *Supra.*

## D.    Detrimental Reliance

Genie-Lyn and Lloyd's also argue the concept of detrimental reliance should apply "for breach of the agreement for prompt and complete repairs to the vessel." (Plaintiffs' Tr. Outline, p. 9.) Detrimental reliance is a civilian term, defined at Article 1967 of the Louisiana Civil Code as follows, "A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying." The common law doctrine of promissory estoppel is the primary source of the legal principle inherent in detrimental reliance as found in article 1967. *See* Jon C. Adcock, The 1984 Revision of the Louisiana Civil Code's Articles on Obligations—A Student Symposium: Detrimental Reliance, 45 La.L.Rev. 753, 754 (1985) and citations contained therein.

A claim for detrimental reliance requires: "(1) a representation by conduct or word, (2) justifiable reliance on the representation, and (3) a change in position to the plaintiff's detriment as a result of the reliance." Drs. Bethea, Moustoukas and Weaver, LLC v. St. Paul Guardian Ins. Co., 376 F.3d 399, 403 (5th Cir. 2004). The concept of detrimental reliance is "designed to prevent injustice by barring a party from taking a position contrary to his prior acts, admissions, representations, or silence." Id (citing Babkow v. Morris Bart, P.L.C., 726 So.2d 423, 427 (La.Ct.App. 4th Cir. 1998)).

As detrimental reliance is a concept of Louisiana law, it is uncertain that it is the applicable law; however, this Court finds under the facts of this case, the doctrine, even if applicable, would not apply. The Court has found the Reeves' assertion that statements made by Mr. DeLoach following the collision entitled them to damages over and above that which is warranted under maritime law is not supported by the facts and evidence in this case; thus the Reeves acting on behalf

24

of the corporate entity Genie-Lyn did not have a "justifiable reliance on the representation." This Court also has previously found the Reeves did not rely on any representation to their, the corporate entity's or their insurer's detriment. To the extent the Reeves, acting on behalf of the corporation, relied upon anyone's promise or approval, they relied upon Lloyd's agents' approval; and Lloyd's gave that approval as contemplated by their obligation under the insurance contract Lloyd's had with Genie-Lyn with full knowledge of all relevant facts and with no evidence they did so relying on Continental's alleged statement. Lloyd's was obligated to make repairs at and to replacement value by their insurance contract.

Further, this Court's previous findings of fact do not in any way support a finding that Continental or its insured took a position which was contrary to any of their prior acts, admissions, representations or silence; rather, this Court finds to the contrary. They acted in harmony with the statement made. They showed a willingness to repair the vessel and acted consistent with that willingness. Thus, this Court finds the legal concept of detrimental reliance does not apply.

## V.     Property Damage Claims

Certain damage and subsequent repair are not in dispute and defendants do not urge reimbursement or reduction of those amounts. Thus, this Court's analysis will focus on the remaining claims for damages which are in dispute and will apply the law of tort as it exists within the general maritime law.

### A.     Painting of the ENCHANTRESS

Plaintiffs claim that, due to damages caused by the allision, the ENCHANTRESS had to be repainted at a cost of $363,786.60, and therefore, they are owed that amount by defendants. Defendants dispute the necessity of painting of the entire vessel, the necessity of certain procedures

used, and argue the application of the legal concepts of betterment and/or depreciation. In support

of plaintiffs' assertion, plaintiffs submit Little Harbor Marine Work Order No. 514658 (in the

amount of $363,786.60) as proof of the damage and cost of repair.[19] (See Exhibit P-124, attached

hereto as Court Attachment B.) Defendants presented evidence to support their argument that certain

portions of the repair were not occasioned by the allision and also in support of their argument urging

the application of betterment and depreciation which will be discussed fully below, thus, plaintiffs

bear the burden to show the necessity of the repair and costs incurred. Pizani, *supra*.

---

[19]This Court notes the estimate for painting the ENCHANTRESS given by Little Harbor Marine in April of 1999 when Little Harbor believed the ultimate customer to be Mr. Reeves, an individual, and not Genie-Lyn's insurer, was approximately $190,000. This estimate was given by Little Harbor Marine to Mr. Reeves while the ENCHANTRESS was in Morgan City, Louisiana and before the vessel was taken to Rhode Island by the Reeves in May of 1999. However, Little Harbor Marine ultimately charged Lloyd's, the insurer, $363,786.60 for painting the ENCHANTRESS. (See Work Order No. 514658.)

However, with respect to the estimate of approximately $190,000 given to paint the ENCHANTRESS, Mr. Sheets of Little Harbor Marine testified that this estimate given to Mr. Reeves in April,1999 did not include "fairing" or what has been referred to as "bondo work." Little Harbor Marine assumed, based on a conversation with Mr. Reeves, that the fairing of the hull would be completed prior to the arrival of the ENCHANTRESS at Little Harbor Marine.

Allen Eschette of CJC Shipyards also testified that "fairing" was a necessary part of "painting" the ENCHANTRESS. The bid of $250,000 received from M&D Yacht Refinishing included "fairing" and "painting" to the specifications in Exhibit D-1B of the Joint Survey Report. (Testimony of Allen Eschette of CJC Shipyards, Tr. Day 2, pp. 188-190.)

This Court finds it telling that the approximately $190,000 estimate given by Little Harbor Marine to an individual, Mr. Reeves, which did not include hardware removal and reinstallation (approximately $11,000), nor the "fairing" work (approximately $50,000), if increased by the cost of "fairing" and hardware removal and reinstallation, approximates the $250,000 bid for painting, "fairing" and hardware, given by M&D Yacht Refinishing to Lloyd's by way of CJC Shipyards prior to the Reeves moving the vessel to Little Harbor Marine for painting and teak replacement. Defendant's Exhibit D-1B. However, this Court cannot know what the actual cost of the bid work would have been had either of the other two companies actually performed the repairs bid upon.